948 A.2d 653 (2008)
400 N.J. Super. 474
Barbara MASSARANO, Plaintiff-Appellant,
v.
NEW JERSEY TRANSIT and Frank Fittipoldi, Defendants-Respondents.
Docket No. A-5719-05T5
Superior Court of New Jersey, Appellate Division.
Argued October 24, 2007.
Decided January 30, 2008.
*654 Edward Broderick, Jr., Morristown, argued the cause for appellant (Broderick, Newmark & Grather, attorneys; Mr. Broderick and Alan J. Baldwin, on the brief).
Robert P. Preuss, Deputy Attorney General, argued the cause for respondents (Anne Milgram, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Mr. Preuss, on the brief).
Before Judges WEFING, PARKER and R.B. COLEMAN.
PARKER, J.A.D.
Plaintiff Barbara Massarano appeals from an order entered on June 7, 2006 *655 granting summary judgment in favor of defendants dismissing plaintiffs claim for retaliation under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. After carefully considering plaintiffs arguments in light of the applicable law, we affirm.

I
The following is a summary of the facts relevant to this appeal. Plaintiff began working as Security Operations Manager for New Jersey Transit (NJT) in August 2001. Defendant Frank Fittipoldi, the Director of Organization Services for NJT, hired and supervised plaintiff. After she was hired, plaintiff learned that Gateways Security, Inc., the contract provider of security services for NJT, was actually her employer, although Fittipoldi had represented that the job was "a Transit position," meaning that she would be an NJT employee. Plaintiff maintains that she would not have left her previous job if she had known she would not be an NJT employee.
Under its contract, Gateway provided NJT with a security manager, but that position did not include a pension or health benefits. Fittipoldi recommended that plaintiff be hired but claimed that it was Gateway's decision to hire her, not his. Gateway paid plaintiffs salary. Kurus Elavia, CEO of Gateway, corroborated Fittipoldi's testimony, stating that under Gateway's contract with NJT, he (Elavia) "had the right to decide on the identity" of the NJT security manager, but that NJT could veto his choice or request a replacement. Plaintiff testified that after she learned she was actually a Gateway employee, Fittipoldi assured her the job would be "moving under" NJT in three to six months and that she would have NJT benefits. Fittipoldi disputed that statement and recalled that plaintiff said she did not need benefits because she had them from her prior employer.
Regardless of who was her actual employer, plaintiff worked in an office that was owned, controlled, operated, decorated and managed by NJT. She used NJT equipment and telephone service and was directly supervised by Fittipoldi.
When she was hired, plaintiffs responsibilities included supervision of twelve security personnel in Newark and Maplewood. She instituted training, raised standards, enhanced and updated guidelines and manuals, established a tiered pay scale to attract and retain better employees, terminated workers who did not improve their performance, upgraded equipment and prepared a business plan for the security office. Her responsibilities were expanded to include NJT's Kearny facility and the NJT concourse in New York's Penn Station. During her tenure, plaintiff hired additional personnel, increasing her staff to forty-five employees. Plaintiff testified that she "discussed everything" with Fittipoldi and that he participated in and approved plaintiffs assignments and proposals.
Fittipoldi acknowledged that plaintiff worked in NJT's offices, using NJT's equipment and that he controlled her work. He indicated that although he commented on her performance, he never gave her a formal evaluation. In September 2001, Fittipoldi formally proposed converting plaintiffs position to NJT. In October 2001, he recommended to his supervisor, Frank Hopper, Assistant Executive Director for Procurement, that NJT establish "an in-house security operations manager." Hopper agreed but noted that there was "a formal process of establishing jobs" at NJT.
In November 2001, plaintiff inquired about the status of the NJT position. Fittipoldi *656 assured her that "everybody was on board" and that the transfer was "a formality." By February 2002, however, Fittipoldi was equivocal about the transfer of the position and it became "a constant topic of discussion" between Fittipoldi and plaintiff.
In the Spring of 2002, Fittipoldi told plaintiff that the Board had approved the job but that it "had to pass the budget" and "was in Mr. Hopper's hands." Fittipoldi explained that when he added the position to the budget in 2002, he was "fairly confident that it would be done."
In the summer of 2002, however, Hopper told Fittipoldi that he could not recommend the new position because of "significant budgetary problems." In August 2002, Fittipoldi told plaintiff that NJT was discussing downsizing and it was not a good time to push for the position.
On August 15, 2002, shortly after plaintiff learned that her position would not be transferred to NJT, plaintiff was advised by the Newark building supervisor that he saw some schematics that were discarded in a bin on the loading dock of the Newark building. Dan Sattazahn, the security operations supervisor who reported to plaintiff, accompanied plaintiff to the area where they found four recycling bins loaded with blueprints or schematics for bridges, tunnels, a new rail operations center, underground gas lines, and building specifications, including HVAC, electrical and plumbing schematics.
Plaintiff was "outraged that this could just be sitting around with nobody there." She testified that "it was a serious situation to have these documents there and available to anyone. . . . [I]t had to at least be some kind of an infraction or violation of policy and some kind of threat to public safety and security. . . . [T]he documents should not be left where anyone can get them." Because NJT shared this area with other building tenants, plaintiff was concerned that anyone could enter the loading area and retrieve the discarded plans and schematics. Sattazahn believed that "this was a disturbing display of gross negligence."
Neither Fittipoldi nor Hopper were at work on the day plaintiff discovered the discarded plans and schematics on the loading dock. Consequently, plaintiff contacted Gwen Watson, NJT's Executive Secretary, who was acting as Executive Director that day. When Watson learned of the discarded documents, she called Peter Saklas, Assistant Executive Director of Engineering and Construction. Saklas looked at the documents and said they were "old drawings that we're throwing out." Watson believed that "Saklas knew what he was talking about" and was "not concerned any more." Sattazahn took custody of the documents and inventoried them.
The next day, when Fittipoldi returned, plaintiff informed him of the discarded documents. She claimed that he was "livid" and "furious" that she went to Watson and that he told her, "If anything ever happens like this again, you come right to me and don't go to anyone else." Plaintiff claimed that "the way he said it was very direct, very loud . . . and very mean spirited." Later that day, plaintiff said Fittipoldi told her that "if somebody wanted to blow up New York Penn Station, they only had to walk in with bombs strapped to them, they didn't need plans." Plaintiff claimed that thereafter Fittipoldi did not talk to her for weeks.
A day or so after plaintiff reported finding the plans and drawings on the loading dock, Hopper asked Fittipoldi to follow up on the complaint and meet with members of Saklas's staff. Fittipoldi and Saklas asked two members of Saklas's staff to *657 investigate the issue. Fittipoldi testified that at that meeting
we discussed what was depicted on the drawings. One of the things that we discussed was that some of the drawings showed architectural plans of certain train stations, bus depots, platforms, park and rides, and the like, train tracks and so forth. There were a multitude of different things shown on the drawings. We discussed whether any of these items or any of this information might be safety sensitive. No one really knew what that meant. That meant possibly that someone had an opinion that there might be safety implications. We agreed on one thing, that we didn't know for sure which of the drawings would be safety sensitive. However, many of the drawings that were looked at depicted public areas of public facilities. And the information on the drawings such as structural elements, position[s] of columns, gas pipes entering the facility, ventilation ducts for outside air intake and so forth could bethis information could be ascertained simply by walking through the public areas of these public facilities and observing with the naked eye. So that was something that was prevalent in our discussion, that is we thought what was found in these dumpsters [were] not trade secrets. It was details that could be observed in person.
. . . .
We talked about the fact that many of these drawings were in the public domain. They were in the hands of various contractors, bidders, subcontractors, railroad historians and train rail fans and buffs that collected drawings of train stations. We also talked about the fact that our procurement department makes these drawings available whenever there is a construction project[,] new or rehab job or something like that[,] in one of these facilities that these drawings are given to bidders, in fact, sold to bidders. We charge them for the copy cost. To any bidder that comes up with a $50 or $100 check any bidder that is willing to come to the facility and pay for the drawings. They also freely copy the drawings and send them out to a multitude of subcontractors to prepare sections of their bids, different elements of the job.
So one of the prevalent sentiments in this meeting was that the drawings put in the dumpster in a secured area was not the most serious part of a potential problem of public safety.
. . . .
We all agreed that there was a larger concern that should be eventually dealt with and that was determining which information and it's not just drawings, it's also printed material information about our sites, our operations that might be safety sensitive. This was a matter for police, not building management and not an engineering group and not even exclusively for a procurement and contracts group that provides these drawings to bidders. There would have to be some kind of collective approach on a much broader scale. So I provided that information to the Transit police.
Fittipoldi testified that he gave information about the drawings and their potential safety risk to Len Diamond, the "Director of System Intelligence" in NJT's own police department. "[H]e is the person [in] the police department who is trained on facility property threat assessment. So he was the right person to talk to on an issue like this." Fittipoldi indicated that Diamond "was satisfied that the loading dock was kept locked up and secured and wasn't available for public access."
Plaintiff claimed that after Fittipoldi's meeting with Saklas's staff, Fittipoldi *658 "stopped by [her] office again to tell [her] that under no circumstances was [she] to go above him in the future." She testified that his demeanor was "controlled" and that "he did not raise his voice at me, but I could tell from the look on his face, and from the glint in his eye, that he was deeply angry with me." Thereafter, plaintiff claims that Fittipoldi stopped talking to her and issued orders directly to the security desk, instead of going through her. She maintained that he excluded her from meetings and began to criticize and embarrass her in public. When she needed a requisition to pay a trainer, she claimed that Fittipoldi misdirected her, sending her to the NJT website and various other departments, when he had the requisition forms in his possession.
Some time during the summer of 2002, upper management decided to give plaintiff responsibility for fifty fleet vehicles used by NJT employees. Plaintiff was not happy about the decision and, in a conversation with Fittipoldi, "objected to security being assigned to the fleet vehicles," explaining that the "front desk was overwhelmed right now." Fittipoldi told her "it was a done deal. He didn't have any choice about it. It was going to save the company a lot of money." Plaintiff testified that she "agreed that it was a great idea" but "just wanted to have some input in[to] how it was implemented." She claimed that Fittipoldi deliberately excluded her from meetings planning for the transfer of the fleet supervision to her.
In the Fall of 2002, Fittipoldi held a meeting to discuss implementation of the fleet transfer program. Plaintiff claimed that Fittipoldi asked her and Sattazahn for feedback about the program and they prepared for the meeting, but that Fittipoldi would not allow her to speak during the meeting. When plaintiff became upset and complained that she was not being permitted to speak, Fittipoldi called her "obstructionist" and indicated that her "performance had been slipping of late." Fittipoldi denied that he commented on plaintiffs performance and testified that plaintiff "continued insisting] that we do not move ahead with this program because A, she hadn't been consulted. B, it was inappropriate to use security guards for this function and C, she wasn't able to hire a driver anyway." Fittipoldi testified that plaintiff was "[disrespectful, unprofessional, belligerent and obstructionist" at the meeting. He stated that "she was absolutely refusing to move ahead with the implementation of the fleet program" and her behavior "was borderline insubordination." Fittipoldi testified that the "meeting was a pivotal part of my decision to separate us from Massarano."
In October 2002, plaintiff tape recorded a conversation with Fittipoldi. During that conversation, plaintiff told him that she "need[ed] to know where I am in the organization . . . I need to know if I'm in jeopardy, I need to try to plan. . . . what I'm supposed to do. . . ." They discussed plaintiffs position being transferred to NJT and Fittipoldi's budgetary concerns with the transfer approval. During the conversation, Fittipoldi told plaintiff that he thought she was "very obstructionist" at the meeting, as if she "just had a chip on [her] shoulder about everything." He added that when plaintiff continued to resist, he "had enough of it after a while." Nevertheless, he stated that her "performance [was] more than acceptable" but that he did not "like the mentality" she had "right now." Plaintiff continued the discussion, stating that she had "life decisions" to make, that she was "overqualified for the job" and that her "resume was pretty decent." Ultimately, Fittipoldi told plaintiff "[y]ou've got the job as long as you want it. [You] [a]lso need, I think to continue to approach [the job] every day *659 as if you're going to be here forever. I know it's really hard if you don't really feel it."
By December of 2002, plaintiffs job transfer to NJT still had not been approved. Plaintiff believed that Fittipoldi "started bullying [her] after August" and that he was not actively pursuing the transfer of her position to NJT. She believed the transfer had been approved "[a]nd it was just a budget issue." In December 2002, she had a conversation with Fittipoldi in which she told him that she "didn't think that he cared about the security, that it was more of a political impression and decisions that he was making rather than security."
Plaintiff testified that Fittipoldi had "a sign in his doorway that alludes to the fact that if you can't be loyal to your boss, then you should find someone else to be your boss or something like that." During the December 2002 conversation, plaintiff pointed to the sign and said, "I don't think I can agree with this" and that she "was having a hard time being loyal and respecting him." She then "asked him for some consideration if he felt that I couldn't work for him that he would give me the courtesy of time to find another position." Plaintiff claimed "he said that there was no need to look for another job . . . I would have a job for the next eight and a half years because that's when he planned on retiring." She believed that they had reached a "tentative . . . agreement of sorts" because "we basically buried the hatchet over the incident."
Fittipoldi had a different view of the December 2002 conversation. He testified that "[p]laintiff's comments on this day did poison my relationship with her" and he decided to replace her at that time. He waited, however, "to see if she would just leave in the natural course of things." After the December 2002 meeting, Fittipoldi testified that plaintiff "became increasingly combative with me on many different issues." She repeatedly told him "if you're trying to provoke me to resign, I'm not going to do it" or "[i]f you don't like what I'm doing then you'll have to fire me." According to Fittipoldi, plaintiffs disappointment about the failure to transfer her position to NJT "turned to bitterness and even contempt for [the] company." Plaintiff "totally shut down and failed to communicate with me," Fittipoldi said.
In January 2003, plaintiff argued with Fittipoldi after she saw that her position remained in the Gateway contract. She requested a transfer to a management position in NJT that was vacant due to a retirement. That position, however, had been eliminated.
On January 17, 2003, plaintiff taped a conversation with Fittipoldi during which he told her that she was being terminated. He offered her the opportunity to resign with four weeks severance pay or be laid off in four weeks with no severance pay but having the opportunity to collect unemployment insurance. Plaintiff chose to resign and Fittipoldi assured her that he would give her a good reference.

II
In January 2004, plaintiff filed her complaint alleging violations of CEPA and seeking reinstatement to her prior position with all fringe benefits, seniority rights and accumulated sick and vacation time; compensation for lost wages "and other remuneration inclusive of humiliation and emotional distress damages;" an injunction restraining NJT from further violations of CEPA; reasonable costs and attorneys fees; and punitive damages. Defendants answered the complaint and, after extensive discovery, moved for summary judgment in April 2006. Plaintiff cross-moved *660 for partial summary judgment seeking a ruling that she was an NJT employee and that she had identified a clear mandate of public policy.
During the course of discovery, plaintiff produced an expert report by Harry Smith, a security consultant, former director of security for Lowe's Corporation and a retired New York City police lieutenant. Smith noted that the documents plaintiff discovered on the loading dock on August 15, 2002 included full plans for New York Penn Station's upper and lower levels, plus bridge and tunnel information, and depots and garages where substantial amounts of fuel were stored. Smith opined that this information "would be a terrorist bonanza" because it could enable "a great loss of life," as well as "massive structural damage that could disrupt mass transit in the New York metropolitan area for an extended period of time." Smith stated that Fittipoldi should have had the documents stored in locked metal containers on the premises until they could be shredded. He further noted that Watson's "concern regarding the blueprints," based upon her deposition, was clearly to ensure the documents were not being discarded in error. When she was assured by Mr. Saklas that the documents were `garbage,' she considered the matter closed. In Smith's view, both Fittipoldi and Watson "failed to see the overriding security issue of the incident: Not whether or not the materials should be discarded, but how it should be discarded."
In Smith's "professional opinion, based upon [his] experience and a reasonable degree of certainty," Fittipoldi's and NJT's failure "to destroy (shred) the blueprints and engineering plans, etc., as described in this case, was a departure from the generally accepted standards and practices within the security industry, especially in the post 9-11 era of Homeland Security awareness."
After hearing argument and considering the papers submitted, the trial judge indicated initially that she was
really [. . .] at a loss as to why anybody should be able to come in contact with structural drawings ofof the New Jersey Transit facilities, including means of emergency access and egress, for obvious reasons.
But, that's not what I'm here to deal with. I'm here to ascertain whether or not, with all inferences on the record drawn in favor of Ms. Massarano, this is a case which should survive summary judgment.
Could a reasonable juror determine under the facts as presented to me on this record that retaliatory action has occurred to Barbara Massarano because of her whistle-blowing.
The court noted that plaintiff was an at-will employee, "[a]nd it doesn't matter whether you have cause to terminate someone's employment. They are your employee at will and you can ask them to leave, fire them, at any time, for any reason, no matter how stellar their performance." The judge indicated that she could not find "a clear public policy concerning public safety or health, safety and welfare" that was violated by the placement of the plans and drawings in the bin on the loading dock even "under the circumstance of an extremely security conscious environment we should still have." In the court's view, when plaintiff called Watson, it was "not to report a violation of a clear mandate of public policy, but to say, I don't think this is right. . . . [W]hen she called Ms. Watson[ ] she was merely calling somebody who could give her the okay to do something with what she found." The court further found that "there obviously *661 is no law, rule or regulation that was being violated. And I cannot see a clear mandate of public policy. So the first tine of CEPA Ms. Massarano cannot surmount." Accordingly, the court found that
there was no whistle-blowing on August 15th. [This] was simply a plea for help. A request for an authority to allow her to take possession of these papers and categorize them. And that's all I see on the record. . . . Her job was to find security problems. Andand to fix them. And in an attempt to fix them going to somebody who allows her to take possession of the object that she believes is the source of the problem is hardly whistleblowing.
The court observed that "there has to be a causal connection between the whistleblowing activity and the adverse employment action or the retaliation." With respect to the deterioration of the relationship between plaintiff and Fittipoldi, the court noted
that these unpleasant, uncivil, in some instances really obnoxious interactions obnoxious primarily on the part of Mr. Fittipoldi, between Mr. Fittipoldi and Ms. Massaranotook place as a result . . . of apparently Mr. Fittipoldi being upset because Ms. Massarano had gone above his head to somebody who was Executive Secretary to the Board of Trustees.
This is not an unreasonable action. It was the only thing that she could have done under the circumstances because she couldn't get ahold [sic] of him. . . . And when you are forced to go over somebody's head, aan employee is isvery uncomfortable with it. And you kind of expect that youryour boss is going to be upset, even though you didn't do anything wrong.
The judge considered "that what happened here based on this record is that the relationship and the trust by Mr. Fittipoldi of Ms. Massarano deteriorated. And toto the extent that everything that she did to oppose himincluding everything that took place with regard to . . . the car fleet incidenthe was just not going to [accept]." With respect to the change in plaintiffs responsibilities, the court did not believe that it was "totally unreasonable to think that a security person would have charge of distribution . . . retention and acceptance of New Jersey Transit property such as automobiles." Moreover, the court noted that terms and conditions of employment can be readily changed by the employer; "[t]hey're changed all the time."
In short, the court found no violation of CEPA. The court did, however, find that plaintiff was an NJT employee for the purposes of the CEPA statute. Summary judgment was granted in favor of defendants.

III
In this appeal, plaintiff argues that (1) the trial court's analysis is legally flawed with respect to identifying a law, rule, regulation or public policy that was violated by the documents being dumped in a recycling bin; (2) the trial court erred in determining that plaintiff was not a whistle-blower within the meaning of N.J.S.A. 34:19-3(c)(1) and (2); (3) the trial court erred in finding that a reasonable juror could not determine retaliation toward plaintiff from the facts presented; (4) the trial court failed to adhere to the standards for granting summary judgment; (5) the causal connection between plaintiffs claims of retaliation and her objection to the disposal of the building plans was a fact question for the jury; and (6) plaintiff was an employee of NJT entitled to CEPA protection.

*662 IV
We begin our analysis of this CEPA claim by stating the essential elements plaintiff must demonstrate to maintain a cause of action.
A plaintiff who brings a CEPA action pursuant to N.J.S.A. 34:19-3c must demonstrate that (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Dzivonar v. McDevitt, 177 N.J. 451, 462, 828 A.2d 893 (2003) (emphasis added).]
Plaintiff first argues that the trial court erred in failing to find that disposal of the documents in the loading dock bin violated a law, rule, regulation or public policy. In support of this argument, plaintiff relies on Executive Order No. 21, 34 N.J.R. 2487(a) (August 5, 2005), reprinted in L. 2002 at 1222-25 (2002), the New Jersey Public Transportation Act of 1979, N.J.S.A. 27:25-1 to -34, the New Jersey Domestic Security Preparedness Act, N.J.S.A. App. A:9-64 to -78, and her expert's report. Plaintiff complains that the trial judge failed to cite or discuss these legal authorities.
Defendants respond that the statutes and Executive Order cited by plaintiff are "unrelated to [defendants' trash disposal practices" because they do not pertain to disposal of documents. Defendants correctly maintain that an expert's opinion is not a source of public policy. The expert report could, however, provide evidence of the reasonableness of plaintiffs belief that public policy had been violated. Abbamont v. Piscataway Twp. Bd. of Educ, 138 N.J. 405, 424-25, 650 A.2d 958 (1994).
In Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 444, 846 A. 2d 604 (2004), the Court explained that a "clear mandate of public policy" under N.J.S.A. 34:19-3(c)(3)
conveys a legislative preference for a readily discernable course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, rule or regulation promulgated pursuant to law such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct.
In Mehlman v. Mobil Oil Corp., 153 N.J. 163, 188, 707 A.2d 1000 (1998), addressing whether the CEPA plaintiff had identified a clear mandate of public policy, the Court explained that "the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee."
Plaintiff points further to the Attorney General's proposed regulations to implement the Executive Order, which were circulated on October 18, 2004more than two years after plaintiff discovered the documents on the loading dockexcluding public access to any record relating to:
building plans, blueprints, schematic drawings, diagrams or operational records where disclosure would reveal specific location of life safety and support systems, load bearing structural elements, surveillance techniques, alarm or security systems or technologies, operational and transportation plans or personal deployment.

[N.J.A.C. 13:1F-1.4 Published in 36 N.J.R. 4630(a).]
*663 Again, neither the proposed regulations nor the OPRA public access provisions govern disposal of documents by a governmental agency.
As the Court noted in Mehlman, "the purpose of CEPA is `to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Mehlman, supra, 153 N.J. at 179, 707 A.2d 1000 (emphasis added) (quoting Abbamont, supra, 138 N.J. at 431, 650 A.2d 958). The significant element under CEPA is
that the objecting employee must have an objectively reasonable belief, at the time of objection or refusal to participate in the employer's offensive activity, that such activity is either illegal, fraudulent or harmful to the public health, safety or welfare and that there is a substantial likelihood that the questioned activity is incompatible with a constitutional, statutory or regulatory provision, code of ethics, or other recognized source of public policy.

[Mehlman, supra, 153 N.J. at 193, 707 A.2d 1000 (emphasis added).]
Moreover, plaintiff has presented no evidence to counter defendants' assertion that the documents were readily available to contractors and subcontractors bidding on NJT projects. In short, we agree with the trial court that NJT's disposal of the documents in a bin on the gated loading dock was not a clear violation of a statute, regulation or public policy.

V
Plaintiff contends further that the trial court erred in determining that she was not a whistle-blower under N.J.S.A 34:19-3(c)(1) and (2). The statute provides as follows:
An employer shall not take any retaliatory action against an employee because the employee does the following:
. . . .
(c) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified healthcare professional constitutes improper quality of patient care; [or] (2) is fraudulent or criminal.
Even if we were to find that the disposal of the documents violated public policy, plaintiffs reporting the disposal to Watson did not make her a whistle-blower under the statute. We agree with the trial court's analysis that plaintiff was merely doing her job as the security operations manager by reporting her findings and her opinion to Watson. It is clear from the record that Fittipoldi's anger at plaintiff resulted from her going over his head, not for reporting the disposal of the documents.
We have carefully reviewed the record before us and we are satisfied that plaintiff has presented no evidence to demonstrate that her deteriorating relationship with Fittipoldi resulted from the August 15 incident, other than his annoyance at her going over his head. Nothing in this extensive record leads us to conclude that Fittipoldi or NJT retaliated against plaintiff for reporting the disposal of the documents on August 15, 2002. Rather, the record presents a picture of a supervisor who was annoyed with a subordinate, at-will employee who went over his head to report an incident. Had plaintiff simply taken custody of the documents in her capacity as security operations manager and reported the incident to Fittipoldi the following day, the situation may have been entirely different. Instead, plaintiff took *664 an adversarial position to her supervisor and continued to do so through the Fall of 2002, when she strenuously and publicly objected to having NJT's fleet of fifty vehicles transferred to her responsibility.
Plaintiff has provided transcripts of two conversations with Fittipoldi that she recorded in an effort to persuade us that he retaliated against her. The transcript of the October 2002 conversation gave no indication that Fittipoldi was retaliating against plaintiff for the August 15 report. Rather, the conversation focused on the October fleet meeting. Fittipoldi told her that he thought she was "being very obstructionist" and that she "had a chip on [her] shoulder about everything." Indeed, nothing in the lengthy October 2002 transcript indicates that plaintiffs August 15 report to Watson was affecting her relationship with Fittipoldi or that there was any retaliation against her. The conversation was simply one between a disaffected employee and her supervisor.
Plaintiff, herself, escalated the situation when she told Fittipoldi in December 2002 that she did not respect him and could not be loyal to him. Any reasonable employer would have doubts about an employee who expressed such sentiments. The only reason Fittipoldi did not fire plaintiff on the spot was because he hoped that she would leave voluntarily. When she did not, he gave her the choice of resigning with four weeks severance pay or being laid off with the opportunity to collect unemployment benefits. Plaintiff chose to resign.

VI
Even if plaintiff had established a prima facie case for retaliation under CEPAwhich she has notshe has not met her burden to show that the stated reasons for her termination were pretextual. The "burden shifting analysis under the Law Against Discrimination (LAD) should be applied to CEPA cases." Zappasodi v. New Jersey, Dept. of Corrections, 335 N.J.Super. 83, 89, 761 A.2d 96 (App.Div.2000) (citing Kolb v. Burns, 320 N.J.Super. 467, 479, 727 A.2d 525 (App. Div.1999)). "[O]nce plaintiff establishes a prima facie case of retaliatory discharge, the defendant must then come forward and advance a legitimate reason for discharging plaintiff." Ibid. Here, defendant demonstrated that plaintiffs demeanor was "obstructionist" and "insubordinate" and justified her termination. We agree with the trial court's observation that, although the relationship between plaintiff and Fittipoldi deteriorated after August 15 because plaintiff went over Fittipoldi's head, the relationship became virtually adversarial after the October 2002 meeting regarding the transfer of the vehicles to plaintiffs responsibility. In short, we find no basis in the record to support plaintiffs allegations that Fittipoldi and NJT retaliated against her for the August 15, 2002 incident.

VII
Finally, plaintiff argues that the trial court failed to determine that she was an NJT employee for CEPA purposes. The record clearly indicates, however, that the trial judge stated that she "might be hard pressed to find that [plaintiff] was not an employee of New Jersey Transit for the purposes of the CEPA statute." We agree.
Although plaintiff was paid by Gateway, it is clear that NJT supervised and controlled her employment. An employee is "any individual who performs services for and under the control and direction of an employer." N.J.S.A. 34:19-2. The definition of employee under CEPA could "include workers who may be classified at common law as independent *665 contractors." D'Annunzio v. Prudential Ins. Co., 383 N.J.Super. 270, 280, 891 A.2d 673 (App.Div.), certif. granted, 186 N.J. 608, 897 A.2d 1062 (2006).
[T]he primary focus is on the employer's "control and direction" of the worker's performance of services for the employer, and not on (1) the terms of compensation, (2) the extent to which the employer provides benefits to the worker, or (3) whether the worker provides services for a full week or only part of a week.

[Id. at 277, 891 A.2d 673.]

VIII
We have carefully considered all of plaintiffs arguments in light of the applicable law and we are satisfied that they lack sufficient merit to warrant further discussion in this opinion. R. 2:11-3(e)(1)(E).
Affirmed.