**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0795-20

TAMARA SEPULVEDA,
and LUIS DELEON,

     Plaintiffs-Appellants,

v.

TOWNSHIP OF NORTH BERGEN,
and DEPUTY CHIEF PRINA,

     Defendants-Respondents.

_____

          Submitted November 15, 2021 – Decided March 14, 2022

          Before Judges Rothstadt, Mayer and Natali.

          On appeal from the Superior Court of New Jersey, Law
          Division, Hudson County, Docket No. L-3325-18.

          Mario M. Blanch, attorney for appellants.

          Piro, Zinna, Cifelli, Paris & Genitempo, LLC, attorneys
          for respondents (Daniel R. Bevere, of counsel; Kristen
          Jones, on the brief).

PER CURIAM

Plaintiffs, Tamara Sepulveda and Luis DeLeon, former Emergency Medical Technicians (EMTs) for the Township of North Bergen (the Township), appeal an order dismissing their Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, retaliation claims and granting defendants' motion for summary judgment. We affirm summary judgment as to Sepulveda[1], as it was undisputed based on the summary judgment record that she did not engage in protected activity as required by N.J.S.A. 34:19-(3)(a) of CEPA, but we reverse as to DeLeon and remand for further proceedings.

I.

We detail the relevant facts in the motion record, viewed, as we must, in the light most favorable to plaintiffs. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). On the evening of July 31, 2017, Sepulveda and DeLeon responded to a domestic dispute involving an alleged intoxicated individual, F.A.[2] At that time, plaintiffs were employed as EMTs with the Township's Emergency Management Services (EMS). Police had been

---

[1] We refer to the plaintiffs by their surnames for purposes of clarity, intending no disrespect.

[2] We use initials to protect F.A.'s confidentiality.

A-0795-20

dispatched to the scene after receiving a call from F.A.'s wife, who indicated that she was concerned regarding her husband's behavior.

Officers at the scene, Sergeant Edward Moyano and patrolmen Michael Whalen and Javier Perez, reported that F.A. admitted to consuming alcoholic beverages. They observed that his speech was slurred, and his temperament quickly alternated between "extremely angry" and "mild." Once plaintiffs arrived, Sergeant Moyano indicated that F.A. stood up, put his shoes on, began walking towards the front door to exit, and proceeded toward the ambulance. The officers informed plaintiffs that F.A. was intoxicated and needed to be brought to the hospital. The officers stated that they observed F.A. sweating, red-faced and "repeatedly clench[ing] his jaw [with] what appeared to be muscle spasms." In his report, Officer Whalen noted that F.A. had admitted to drinking a bottle of alcohol, but had "no scent of that beverage on his breath."

In their depositions, plaintiffs materially disputed the police officers' version of events that night. They stated F.A. told them that he did not want to "be checked out by an ambulance." Most importantly, based on their visual observations, plaintiffs testified they did not believe F.A. needed to be transported, as he was "alert and oriented," with a steady gait, normal pupil dilation, and was not slurring his speech. Neither DeLeon nor Sepulveda

3

measured F.A.'s vitals, however, because, as Sepulveda testified, "the patient didn't want to be touched."

At this point, plaintiff DeLeon called his supervisor, Deputy Chief David Prina, to discuss the matter, who purportedly advised him not to transport F.A. against his will. DeLeon testified that he then explained to Sergeant Moyano that EMTs cannot transport a patient without his or her permission, as his training taught him that doing so would be considered kidnapping. In the police reports prepared after the incident, officers reported that DeLeon began to curse loudly and threaten to resign as an EMT, and informed the officers that he planned to file a formal complaint.

Plaintiffs further testified that the officers ostensibly forced F.A. into the ambulance, stating, "you're going to the hospital or you're going to jail." They also allegedly physically blocked F.A. from going back into his home and pushed him towards the ambulance. Based on their statements contained in the police reports, the officers disputed that version of events and reported F.A. voluntarily agreed to go to the hospital before the EMTs arrived.

Plaintiffs testified that they continued to refuse to transport F.A. to the hospital or provide medical care against his wishes. F.A. nevertheless eventually entered the ambulance. While in the vehicle, however, plaintiffs

4

stated that F.A. continued to resist and stated that he "didn't want to go to the hospital, and that he was being forced to [do so]." When they arrived at the hospital, Sepulveda stated that F.A. "was still agitated" and "still screaming that he didn't want to be there."

Plaintiffs also testified that as part of their training as EMTs, they were required to undergo 250 hours of in-class and ten hours of hospital-based training, where they learned about medical and trauma assessments, as well as "the legality of being able to treat a patient." Plaintiffs explained that the Township follows the same protocols as those provided by the State of New Jersey, and EMTs were taught that they cannot force a conscious patient to go to the hospital.

Further, according to plaintiffs, they were instructed that an alert and conscious patient has the right to refuse treatment and can only be transported against their will if they are unconscious, as a lack of consciousness is a form of implied consent. Plaintiffs also testified that if an alert and orientated patient refuses treatment, they were taught that it is considered assault to touch a patient against his or her will.

Both plaintiffs testified that after the incident, they were "pulled off the [work] schedule[s]." Only DeLeon, however, formally reported the incident to

Deputy Chief Prina, his supervisor, via WhenToWork, the computer program the Township used to assign shifts, enable employee messaging and manage calendars. DeLeon also testified that the Township threatened to invalidate his EMT certification, which he believed was retaliatory after his disclosure of the incident. Sepulveda testified that she was issued a written warning for failing to take and record F.A.'s vital measurements. That warning is not contained in the record on appeal, however.

The Township thereafter issued a notice of preliminary disciplinary action (PNDA) to DeLeon only, charging him with: (1) incompetency, inefficiency, failure to perform duties; (2) inability to perform duties; (3) conduct unbecoming a public employee; (4) neglect of duty; and (5) violation of North Bergen EMS Standard Operating Procedures based upon his failure to complete a medical assessment of F.A., as well as his inappropriate outbursts and use of vituperative epithets in front of the patient. Despite the Township's request that he be removed as an EMT, DeLeon did not request a hearing to challenge the charges. He testified that he did not recall ever receiving a copy of the PNDA.

The Township issued a final notice of disciplinary action, sustaining the charges set forth in the PNDA, and DeLeon was later removed from his position. Sepulveda, however, did not report the incident to any superior and elected to

6

resign voluntarily, claiming the environment at the Township's EMS department was "hostile and uncomfortable," and she believed she faced possible "chances of retaliation from [the] North Bergen [police department] when [EMTs] do not comply with their wishes on patient care."

Plaintiffs thereafter filed suit alleging the Township and their former supervisor, Deputy Chief David Prina, violated CEPA. At the conclusion of discovery, defendants filed a motion for summary judgment, which plaintiffs opposed.

The court granted defendants' motion without oral argument, despite plaintiffs' request. In a nine-page written opinion, the court explained that the motion record failed to create a genuine issue of material fact as to whether plaintiffs engaged in CEPA protected conduct. The court reasoned that the "broad stroke claims" of illegal conduct amounted to mere "disagreements" between the police and the EMTs "about whether F.A. required medical assistance," which "is not protected activity within the meaning of CEPA."

Relying on Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005), the court concluded that "[p]laintiffs ha[d] not pointed to any manual, directive, or law they believe the [d]efendants have violated." The court also relied upon Battista v. Olsen, 213 N.J. Super. 137, 142 (App. Div.

A-0795-20

1986), concluding that "had the officers not provided medical treatment after being advised F.A. had ingested illicit substances, the [p]olice [d]epartment would have been liable for F.A.'s injuries."

Further, despite plaintiffs' proofs that F.A. refused to go to the hospital, and their reasonable belief that transporting him without his consent would be a violation of New Jersey law and public policy, the court found that "F.A. voluntarily went to the hospital." The court also found that "[n]either DeLeon nor Sepulveda conducted a patient assessment or offered F.A. the right to refuse medical attention. F.A.'s vitals were not taken." Finally, the court concluded that Sepulveda failed to establish that she engaged in any protected activity as she failed to report or object to "any activity that she believed to be infringing upon patient's rights or in any way affecting patient's safety." This appeal followed.

## II.

On appeal, plaintiffs raise three arguments. First, they contend the court's factual findings in support of summary judgment are unsupported by the record. Specifically, they maintain the court impermissibly concluded F.A. voluntarily accepted transport to the hospital and that plaintiffs failed to conduct a patient

A-0795-20

assessment.[3] Plaintiffs also argue the record contained genuine and material questions of fact as to whether they held a reasonable belief under CEPA that treating and transporting F.A. to the hospital would have violated New Jersey law and public policy. Finally, they maintain the court improperly relied upon our holdings in <u>Klein</u>, 377 N.J. Super. at 38 and <u>Battista</u>, 213 N.J. Super. at 142.

For the reasons that follow, we are satisfied that the motion record contains disputed issues of material fact sufficient to establish a prima facie case of retaliation under CEPA as it related to DeLeon. We reach a contrary conclusion as to Sepulveda. As to her claim, it was undisputed that she never reported the incident to her superiors. We also note she resigned voluntarily, based upon speculative future conduct by the Township's police department.

We would be remiss if we did not address a procedural error committed by the court. Because this application involved resolution of a dispositive issue, oral argument should have been granted as of right under <u>Rule</u> 1:6-2(d). To the extent the court denied the request, it was obligated to state its reasons on the record. <u>R.</u> 1:6-2(d). On remand, and in the event an application is filed within

---

[3] We also note that plaintiffs contend the court incorrectly characterized Sepulveda's testimony with respect to an intoxicated patient's ability to consent to medical treatment. We need not reach that issue inasmuch as we find summary judgment was properly granted as to Sepulveda on separate grounds. <u>See</u>, <u>infra</u>, at pp. 21-22.

the purview of Rule 1:6-2(d), oral argument should be granted, or the court should comply with that Rule and state the reasons for denying the request should it do so.  See LVNV Funding, L.L.C. v. Colvell, 421 N.J. Super. 1, 5 (App. Div. 2011).

Although we note there was no oral argument, we find "no prejudice has resulted from the [court's] failure to comply with the rule," because we are reversing and remanding as to DeLeon.  Spina Asphalt Paving v. Borough of Fairview, 304 N.J. Super. 425, 427, n.1 (App. Div. 1997).  We also conclude, for the reasons discussed in this opinion, that the motion record failed to create a genuine and material question of fact that Sepulveda established a prima facie case under CEPA, and oral argument would not have altered the outcome, inasmuch as a party cannot supplement the record during such a proceeding.

As to the merits of plaintiffs' arguments, we recite the applicable standard of review.  When reviewing an order granting summary judgment, we apply the same standards the trial court applies when ruling on a summary judgment motion.  Townsend v. Pierre, 221 N.J. 36, 59 (2015).  Thus, we review "the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law."  Bhagat v. Bhagat, 217 N.J.

A-0795-20

22, 38 (2014); R. 4:46-2. Summary judgment should be denied unless the moving party's right to judgment is so clear that there is no room for controversy. Akhtar v. JDN Props. at Florham Park, L.L.C., 439 N.J. Super. 391, 399 (App. Div. 2015).

The trial court and the reviewing court must view the evidence in the light most favorable to the non-moving party. Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014). This means summary judgment should be denied if the competent evidential materials, viewed in the light most favorable to the non-moving party, permit a rational factfinder to resolve the disputed issue of material fact in favor of the non-moving party. Townsend, 221 N.J. at 59.

The court's function is not to weigh the evidence to determine the final outcome, but only to decide if a material dispute of fact exists. Suarez v. E. Int'l Coll., 428 N.J. Super. 10, 27 (App. Div. 2012). It is not the judge's role to assess credibility or determine the truth of the evidence, DeWees v. RCN Corp., 380 N.J. Super. 511, 522 (App. Div. 2005), or to examine whether the preponderance of the evidence weighs towards one side or the other, Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 71 (App. Div. 2004). A motion judge may not abrogate the jury's exclusive role as the finder of fact. Suarez, 428 N.J. Super. at 27.

A-0795-20

Plaintiffs maintain they were subjected to retaliatory acts by defendants in violation of CEPA, which makes it "unlawful for an employer to retaliate against an employee who 'report[s] illegal or unethical workplace activities.'" Donelson v. DuPont Chambers Works, 206 N.J. 243, 256-57 (2011) (alteration in original) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)). CEPA is designed to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging in such conduct." Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994). Thus, considering this purpose, CEPA claims "should be construed liberally." Ibid.

CEPA prohibits an employer from taking retaliatory action when an employee "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes" is unlawful or fraudulent. N.J.S.A. 34:19-3(a). Specifically, an activity is unlawful when it "is in violation of a law, or a rule or regulation promulgated pursuant to law," N.J.S.A. 34:19-3(a)(1). An employee is also protected where he or she "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . is incompatible

12

with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J.S.A. 34:19-3(c)(3).

A plaintiff asserting a CEPA claim must establish that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 77 N.J. at 462).]

If the plaintiff meets the burden of demonstrating a prima facie case, "the defendant must then come forward to advance a legitimate reason for discharging [the] plaintiff." Massarano v. N.J. Transit, 400 N.J. Super. 474, 492 (App. Div. 2008). If the defendant provides a legitimate reason, the plaintiff must demonstrate why the reason defendant provided for the adverse action is not credible. Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999).

Against this legal background, and for purposes of completeness, we turn to a consideration of each of the four prongs a plaintiff must meet to establish a

prima facie case under CEPA, noting, however, that plaintiffs have briefed only the first prong.

A.

To satisfy the first prong of CEPA, a plaintiff must prove that he or she reasonably believed the conduct at issue was against a law under N.J.S.A. 34:19-3(a)(1) or was incompatible with a "clear mandate of public policy" under N.J.S.A. 34:19-3(c)(3).  See Estate of Roach v. TRW, Inc., 164 N.J. 598, 611 (2000).

Both plaintiffs testified at their depositions that they had learned in the course of their formal training that transporting a patient against his or her will is illegal and tantamount to kidnapping and or assault under New Jersey law. When the North Bergen police forced plaintiffs to ferry F.A. to the hospital against his wishes, plaintiffs allege they had a reasonable belief that such actions violated the false imprisonment statute as well as New Jersey's public policy protecting a competent patient's right to refuse medical treatment.

CEPA's goal is "not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare."  Mehlman v. Mobil Oil Corp., 153 N.J.

163, 193-94 (1998). Accordingly, it is not plaintiffs' "burden to show that the defendant actually violated the law, rule, regulation, or other authority cited, but only to demonstrate that he or she held a reasonable belief that such a violation occurred." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 30 (2014).

Further, plaintiffs need not present evidence that the employer's conduct was actually unlawful, rather a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. Dzwonar, 177 N.J. at 462. The trial court must then "make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." Id. at 464. If a nexus can be established, it is a question of fact for the jury to "determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Ibid.

Our Supreme Court has recognized that in the context of a CEPA claim, "a 'clear mandate' of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that . . . there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct." Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 444 (2004). A "vague, controversial, unsettled, and otherwise

15

problematic public policy does not constitute a clear mandate." MacDougall v. Weichert, 144 N.J. 380, 391 (1996) (A plaintiff must identify a violation of a public policy that is "clearly identified and firmly grounded."). Further, an employee who argues under N.J.S.A. 34:19-3(c)(3) "must make the additional showing that the 'clear mandate of public policy' he or she reasonably believes the employer's [conduct] to be incompatible with is one that 'concern[s] the public health, safety or welfare or protection of the environment.'" Maimone v. City of Atl. City, 188 N.J. 221, 231 (2006) (quoting Estate of Roach, 164 N.J. at 609-11).

In addition, any "determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law" for the court. Mehlman, 153 N.J. at 187. The sources of public policy that a court may rely upon "include legislation; administrative rules, regulations or decisions; and judicial decisions." Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72 (1980).

In New Jersey, there exists well-settled public policy protecting a patient's right to make his or her own healthcare decisions. In Matter of Quinlan, 70 N.J. 10, 51 (1976), our Supreme Court first recognized a constitutional "right of choice" with respect to medical decisions and a "right of privacy that might

A-0795-20

permit termination of treatment" in certain circumstances. In <u>Matter of Conroy</u>, 98 N.J. 321, 347 (1985), the Court reaffirmed this right, holding that a "competent adult person generally has the right to decline to have any medical treatment initiated or continued." <u>See also</u> <u>Matter of Farrell</u>, 108 N.J. 335 (1987) (holding that a patient holds the right to refuse medical attention even if treatment is necessary for survival).

The right of a competent person to refuse unwanted medical care is also recognized as a liberty interest under the Fourteenth Amendment. <u>See</u> <u>Cruzan v. Director, Missouri Dept. of Health</u>, 497 U.S. 261, 271 (1990). This right is also recognized explicitly in the New Jersey Advance Directives for Health Care Act, in which the Legislature declared, "[t]his State recognizes, in its law and public policy, the personal right of the individual patient to make voluntary, informed choices to accept, to reject, or to choose among alternative courses of medical and surgical treatment." N.J.S.A. 26:2H-54(a).

Applying this authority, we are satisfied that plaintiffs presented sufficient evidence to meet the requirements of the first prong of the CEPA test, as they identified a clear mandate of public policy that concerns the public's health and safety. Specifically, that a patient may, under certain circumstances, refuse medical care. Indeed, here, both parties acknowledge that New Jersey public

17

policy supports a competent patient's right to refuse medical treatment, provided the patient is alert and oriented.

Additionally, the circumstances surrounding F.A.'s voluntary transport were critical to determining whether the officers' conduct, and defendants' apparent acceptance of their actions, was a violation of this well-settled public policy. In this regard, we are satisfied that the motion record, specifically plaintiffs' deposition testimony as compared to the police reports, and other proofs, contain genuine and material questions of fact as to whether F.A. was in need of medical care and was transported to the hospital voluntarily.

We are also satisfied that the cases relied upon by the court and defendants, Klein and Battista, do no warrant a contrary result. In Klein, plaintiff, a radiologist, based his CEPA claim on a disagreement with internal decisions made by the hospital at which he was employed, including requests for "additional staffing, more space, and special procedure rooms permanently stocked with equipment and supplies rather than generic rooms with portable machinery and supplies." Klein, 377 N.J. Super. at 44. He alleged retaliation resulting in "revoc[ation of] his clinical responsibilities for several days and requiring observation [once] restored after he refused to be assigned to the Radiology Department based upon his 'reasonable belief that such anesthesia

assignments were a threat to patients' safety' in violation of N.J.S.A. 34:19-3(c)." Id. at 33. We held that plaintiff had "not sufficiently identified any illegal, unethical, or public policy violation sufficient to satisfy the first prong of a prima facie case of a CEPA claim under the language or intent of N.J.S.A. 34:19-3(c)." Id. at 45.

Though the doctor in that case alleged specific violations of Hospital Licensing Standards, we concluded that "merely couching complaints in terms of a broad-brush allegation of a threat to patient's safety is insufficient to establish the first prong of a CEPA claim." Id. at 42. We also commented that the "whistle-blower legislation is not intended to shield a constant complainer who simply disagrees with the manner in which the hospital is operating one of its medical departments, provided the operation is in accordance with lawful and ethical mandates." Ibid.; see also Young v. Schering Corp., 275 N.J. Super. 221, 237 (App. Div.1994) (observing that "[a]lthough CEPA protects a broader category of employee behavior than the common law, the Act nevertheless was not intended to provide a remedy for wrongful discharge for employees who simply disagree with an employer's decision, where that decision is entirely lawful").

A-0795-20

Rather than a debate over quality of care and the proper use of hospital resources, this case involves circumstances under which plaintiffs contend the patient, F.A., was not in need of any medical attention. Unlike Klein, the issue before us is whether a patient, who shows no indicia of acute or chronic distress, requiring medical attention, can refuse unnecessary treatment.

In Battista, we affirmed the trial court's finding of a police officer's partial liability in a wrongful death action, after he failed to summon medical assistance, despite his knowledge of the decedent's condition. Here, as noted, there remains a question of fact as to whether F.A. required medical attention. Further, Battista did not involve a CEPA claim.

B.

Under prong two, a plaintiff must establish that "he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19-3(c)." Lippman, 222 N.J. at 380. A "whistle-blowing" activity "refers to notification, or threatened notification, to an outside agency or supervisor . . . and also permits a claim to be supported by evidence that the employee objected to or refused to participate in the employer's conduct." Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 106 (2008). The whistle-blowing activity must reflect a "threat of public harm, not merely a private harm or harm only to the aggrieved employee." Maw v.

Advanced Clinical Commc'n, Inc., 179 N.J. 439, 445 (2004). "Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 529-31 (2013).

Here, the motion judge found that Sepulveda did not satisfy this requirement. We agree. Plaintiffs allege only that Sepulveda documented the incident in her patient care report from the night of July 31, 2017. The record on appeal does not contain this report, however, and there is no indication that Sepulveda's supervisor, or the Township EMS department, received that report. Moreover, in her deposition testimony, Sepulveda denied having reported the incident to any superiors, as evidenced by the following colloquy.

> DEFENSE COUNSEL: [Regarding the July 31, 2017 incident] Who did you report it to?
>
> SEPULVEDA: I didn't. [DeLeon] did to our deputy chief.
>
> DEFENSE COUNSEL: But you personally never made any sort of incident report?
>
> SEPULVEDA: Just my patient care report.
>
> DEFENSE COUNSEL: Okay . . . You never made any formal complaint to Deputy Chief Prina or [the Chief] about the incident with [F.A.], meaning you never filled

out a separate form, like [DeLeon] did, on WhenToWork about what happened?

SEPULVEDA: Not that I recall.

Plaintiffs have pointed to nothing in the record to dispute this testimony. As such, we agree with the court that Sepulveda's CEPA claims fail because she did not make the requisite disclosure under N.J.S.A. 34:19-3(a). As noted, however, plaintiff DeLeon formally reported the July 31, 2017 incident to his supervisor, Deputy Chief Prina, via WhenToWork, thereby satisfying N.J.S.A. 34:19-3(a) and the second prong under Lippman.

C.

The third CEPA prong requires a plaintiff to demonstrate that "an adverse employment action was taken against . . . h[im]" by defendant. Lippman, 222 N.J. at 380. Under N.J.S.A. 34:19-2(e), "retaliatory action" is defined as "the discharge, suspension or demotion of any employee, or other adverse employment action taken against an employee in the terms and conditions of employment." "What constitutes an 'adverse employment action' must be viewed in light of the broad remedial purpose of CEPA, and [a court's] charge to liberally construe the statute to deter workplace reprisals against an employee speaking out against a company's illicit or unethical activities." Donelson, 206 N.J. at 257-58.

An adverse employment action can include "making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations—causing the employee to suffer a mental breakdown and rendering him unfit for continued employment." Id. at 258. Additionally, retaliation can be "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003).

Here, we are satisfied that DeLeon presented sufficient evidence to satisfy the third prong under Lippman. After the Township issued the final notice of disciplinary action, which encompassed the charges set forth in the PNDA, DeLeon was terminated from his employment as an EMT. For purposes of summary judgment, that discharge clearly qualifies as "an adverse employment action" under the third Lippman prong.[4]

---

[4] Plaintiffs allege Sepulveda was "allowed to return after she was given a written warning," a document which, as noted, is not contained in the record. She also stated the reasons for her resignation included the "overall behavior" at the EMS department, which made her "really uncomfortable." Because we find Sepulveda's claims fail under the second Lippman prong, we need not address whether this written warning, or the alleged behavior of her employer, constituted adverse action under the statute.

To satisfy the fourth prong of the CEPA test, plaintiffs must demonstrate that "a causal connection exists between the whistle-blowing activity and the adverse employment action." Lippman, 222 N.J. at 380. A causal connection "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone, 188 N.J. at 237 (citing Estate of Roach, 164 N.J. at 612). Therefore, the plaintiff does not need to show a "direct causal link" between the whistle-blowing activity and the retaliation. Battaglia, 214 N.J. at 558. "The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Maimone, 188 N.J. at 237; Estate of Roach, 164 N.J. at 612.

Based upon our de novo review of the record, we conclude that DeLeon presented sufficient evidence to meet the requirements of the fourth prong to survive defendants' summary judgment application. Despite the reasons set forth in the final notice of disciplinary action, there remain factual disputes in the record that call into question whether DeLeon's termination was based upon

the conduct described in the PNDA or whether he was discharged in retaliation for his "whistle-blowing."

We note that these factual issues are substantial because DeLeon alleges the PNDA was a pretext for his discharge. Indeed, his claims and attendant proofs that the Township terminated his employment as a consequence of his reporting invoked the burden-shifting paradigm addressed in Massarano, 400 N.J. Super. at 492. Burden shifting was neither addressed by the parties, nor explored further by the court, and as such, we do not address it, and we are satisfied that as far as establishing a prima facie case, the record contains sufficient questions of fact regarding causation.[5]

To the extent we have not specifically addressed any of plaintiffs' arguments, it is because we have considered those contentions of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] Again, we need not address whether Sepulveda's resignation was causally related to any reporting, as we have concluded, based upon the competent materials before the motion court, she did not disclose the officers' conduct to her supervisor. We note, however, that unlike DeLeon, she was not terminated following the incident, nor in her resignation did she specifically identify any complaint regarding the July 31, 2017 incident.

A-0795-20